**Thomas L. SCOTT, Plaintiff-Appellant,**

v.

**Louis W. SULLIVAN, M.D.,\***
**Defendant-Appellee.**

No. 89–1378.

United States Court of Appeals,
Seventh Circuit.

Submitted Feb. 7, 1990.\*\*

Decided Feb. 22, 1990.

Opinion Published March 28, 1990.\*\*\*

---

\* Louis W. Sullivan, M.D., has been substituted as appellee for Otis R. Bowen, M.D., pursuant to Fed.R.App.P. 43(c).

\*\* After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." *See* Rule 34(a),

Fed.R.App.P.; Circuit Rule 34(f). No such statement having been filed, the appeal has been submitted on the briefs and record.

\*\*\* Pursuant to Circuit Rule 53, this opinion was originally issued as an unpublished order on February 22, 1990. The court, upon request, issues this decision as an opinion.

John Manning, Wisconsin Rapids, Wis., for plaintiff-appellant.

Michael C. Messer, Dept. of Health and Human Services, Region V, Office of the Gen. Counsel, Chicago, Ill., for defendant-appellee.

Before BAUER, Chief Judge, CUDAHY, Circuit Judge, and PELL, Senior Circuit Judge.

PELL, Senior Circuit Judge.

Claimant Thomas L. Scott appeals the district court's affirmance of the Secretary's determination[1] that Scott is not disabled under the Social Security Act and therefore is not entitled to benefits.

I.

When the disability hearing in this case was held in 1987, Scott was forty-one years old, had a general education diploma, and had been employed at Consoweld Corporation (n.k.a. Sterling Engineered Products) since 1967 as a laborer. His job involved substantial lifting, bending, stooping, and carrying of materials usually weighing fifty to sixty pounds but sometimes as much as 100 pounds. Scott injured his back at work on April 28, 1976. During 1977, Scott twice reinjured his back at work, and in early 1980, Scott reinjured his back at home.

On June 11, 1980, Scott underwent a laminectomy. Dr. Beuchel, who had previously treated Scott for his back problems, performed this procedure which involves the excision of a vertebral arch. Scott reported that the surgery was successful in relieving his pain. Scott was advised to refrain from lifting heavy weights and to avoid excessive twisting and bending. Despite the successful surgery and post-operative therapy, Scott's back problems returned within one year. He received treatment for his problems and consulted various doctors and specialists.

In August 1983, Scott again reinjured his back at work. He saw a chiropractor, Dr. Birdwell, who diagnosed a sprained back. On September 18, 1983, Scott returned to work with no restrictions on the amount of weight he could handle. In late 1984, Scott was involved in an automobile accident that aggravated his back condition. In early 1985, Scott returned to Dr. Beuchel for treatment. Dr. Beuchel recommended that Scott be assigned to light duty work and recommended reinstituting restrictions on the amount of weight Scott should handle on the job. Dr. Beuchel also referred Scott to Dr. Szmanda, a neurologist, for further evaluation.

In July 1985, Scott was hospitalized for three days. An EMG and nerve conduction study were undertaken by Dr. Szmanda who concluded that the results were abnormal and evidenced moderate acute denerva-

1. The Appeals Council declined review of the ALJ's opinion; thus, the opinion became the final decision of the Secretary. *See Steward v. Bowen,* 858 F.2d 1295, 1296 n. 1 (7th Cir.1988).

tion in one area and partial denervation in another. His diagnosis was "moderate to severe peripheral nervous system disease with the presence of superimposed corticospinal tract pathology." A myelogram taken in October 1985, however, was negative for disc herniation or nerve root displacement, but did show some disc bulging. A CT scan confirmed these results. In December 1985, Dr. Beuchel approved Scott's return to work with the previous restrictions.

Scott continued to have lower back pain and consulted Drs. Beuchel and Szmanda, among others, about further treatments. The possibility of a second laminectomy and spinal fusion was discussed, but no action was taken. On August 8, 1986, Scott stopped going to work. Scott was hospitalized from August 19 to 20, and Dr. Szmanda conducted several tests. A myelogram again showed that no disc was herniated, but that visible bulging existed. Scott was diagnosed as having "sensorimotor peripheral polyneuropathy and spastic paraparesis."

Dr. Beuchel wrote on August 26, 1986, that Scott had suffered a 20% permanent partial disability of his back and that a second laminectomy and fusion were probably indicated. He further wrote that Scott reported that he was only able to stand four to six hours in an eight hour workday, sit for four hours, ride in a car for up to eight hours, and lift frequently a maximum of twenty pounds.

On September 8, 1986, Scott filed for disability benefits, alleging that his disability began on August 8, 1986 (the last date he worked at Consoweld). On October 8, 1986, Consoweld referred Scott to Dr. Allen for an examination. Dr. Allen concluded that, although Scott could perform all of the activities of daily living, he doubted "[Scott] is ever going to get much better." On November 11, 1986, the Social Security Administration informed Scott that he was denied disability benefits. Scott appealed this initial decision, but it was affirmed on January 6, 1987.

On February 18, 1987, Dr. Beuchel reexamined Scott and reported that his condition had worsened. He wrote that Scott thought that the previous estimates were too high—"[Scott] felt standing should be 1 to 3 hours, sitting about 2 to 3 hours, driving 2 to 3 hours, lifting 10 to 20# ." Dr. Beuchel concluded his letter by stating that Scott "is presently totally disabled as far as Social Security is concerned at this time." On February 20, 1987, Scott requested a hearing on his request for benefits.

A hearing on Scott's case was held on June 1, 1987, before an Administrative Law Judge.[2] At the hearing, Scott and his wife testified, and Scott's attorney entered into evidence numerous medical exhibits. Scott testified that his back constantly gave him pain; he said he occasionally took medication (Flexoril) to relieve the pain, but that he avoided the medication when possible because it made him drowsy. He stated that his activities were limited by the injury, but that he could still help around the house with chores such as carrying the groceries, setting the table, and cutting the lawn with a riding mower. In addition, he testified that he was able to go hunting and fishing occasionally, ride a bike from time to time, and could walk four blocks without back pain.

At end of the hearing, Scott's counsel and the ALJ had the following discussion:

ALJ: ... Are there other matters you want to get into today?

ATTY: Judge, there's one thing that I would like to offer for the Judge's consideration, under the listing of impairments. If I can find what I'm looking for here. Under List 105C, which has to do with, it's called vertebrogenic disorders.

ALJ: Right, I have it before me.

ATTY: And I wish the Judge would consider whether he meets this listing of impairments—

**2.** On May 29, 1987, two days before the hearing, Consoweld notified Scott that there were no positions at the company that Scott could perform given his back problems. As a result, the company terminated his employment due to his medical condition.

ALJ: All right.

ATTY: —particularly with regard to the reports in the record from ... Dr. Simanda [sic].

ALJ: What I could do is have a[n] MA, medical advisor, on this, interrogatories. And that way the doctor would be reviewing, if he should conclude that Mr. Scott doesn't quite meet but does equal it, that would be the same thing. But I think that it would be, over the long haul, the shortest way home to go for one that's on the Secretary's list because that's the only one we'd be sure of on the equals, if he would conclude that it equals the listing.

ATTY: All right....

ALJ: ... [W]ould Dr. Simanda [sic], conclude that he met, do you think?

ATTY: I don't know if he would or not because I don't think he'd have the particular criteria before him.

ALJ: Uh-huh. That's another way to go.

ATTY: That's a possibility.

ALJ: You can pose that.

ATTY: Why don't you let me do that?

ALJ: All right, go ahead. I will leave the file open for, give you 30 days—

ATTY: Very good, very good.

ALJ: —to pose that.... because there are some difficulties. I don't say they're insurmountable but there are some difficulties, given the age of this gentleman [Scott].

....

... I will leave the file open for 30 days. And if you find out earlier that there is ... a possible need to go for a medical advisory on that, let me know.

ATTY: Very good.

ALJ: And I will send for that.

ATTY: Thank you. That's all I have.

After the hearing, Scott's counsel sought to solicit a medical opinion from Dr. Szmanda regarding whether Scott met the requirements of section 1.05c. *See* 40 C.F.R. pt. 404, subpt. P, app. 1. Counsel enclosed a copy and an explanation of the listing to apply to the case. Dr. Szmanda refused to give his opinion on this issue, however, and referred the attorney to Dr. Beuchel. On

August 14, 1987, after several letters from counsel asking for his opinion, Dr. Beuchel responded as follows: "Tom does have evidence of spasm, discomfort, tenderness, a list and pain along with degenerative arthritis of his back with chronic low back pain and intermittent sciatica associated with degenerative disc disease."

Scott's counsel forwarded Dr. Beuchel's letter to the ALJ with the following explanation:

I am submitting to you what I received today from Dr. Beuchel, consisting of one page. It is not what I asked of him, having sent him the appropriate listing of impairments and explanations of those listings to apply in this case. I am afraid that this is the best I can do so please make this part of the record and close the record and make your decision in the case. I am sorry to have delayed it this long but I thought that I could get the additional opinion to make it easy for you.

The ALJ then rendered his decision and held that, although there was no question that Scott suffered from chronic low back pain, he "d[id] not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4." The ALJ held that it was clear that Scott was unable to perform his old job, but that he had the "residual functional capacity to perform the full range of light work." Given this capacity and Scott's age, high school diploma equivalency, and work experience, the ALJ concluded that Scott was not disabled for purposes of the Social Security Act.

On appeal, the district court affirmed on the ground that the ALJ's decision was based on substantial evidence.

## II.

■ Decisions of the Secretary are upheld if they are supported by substantial evidence. *Walker v. Bowen,* 834 F.2d 635, 639 (7th Cir.1987). Scott argues that the ALJ erred because there was *no* evidence in the record to support the ALJ's conclusion that Scott failed to meet the two-pronged requirements of section 1.05c, and

that therefore we should remand to the ALJ for additional findings.

An examination of the record reveals the flaws in Scott's argument. At the hearing, Scott's attorney raised the possibility that Scott qualified for benefits under section 1.05c. 40 C.F.R. pt. 404, subpt. P, app. 1. When asked, the ALJ said that he would consider whether the section was applicable, but suggested that Scott's best theory of recovery, given his age and background, would be to qualify directly under a specific listing, rather than under section 1.05c which is a catch-all for all "other vertebrogenic disorders." *Id.; see also Reynolds v. Bowen*, 844 F.2d 451, 453 (7th Cir.1988).

Scott argues that once the ALJ agreed to consider whether Scott qualified under section 1.05c, the ALJ had a duty to ensure that sufficient evidence on the issue was produced before closing the file and rendering a decision. Scott admits that he could not get either Dr. Szmanda or Dr. Beuchel to offer opinions on this issue, but he argues that the ALJ was under a duty to bring in a medical advisor to offer an opinion so that there would be some specific evidence in the record on which to base an opinion.

Scott's argument is not supported factually.[3] Scott attempted to qualify under section 1.05c; he therefore had to prove *both* (1) that he suffered from pain and muscle spasms, and had significant limitation of motion in the spine; and (2) that there was appropriate radicular distribution of *significant motor loss* with *muscle weakness and sensory and reflex loss.* Scott argues that his medical records clearly show that he met the first prong of section 1.05c because tests showed movement limitation and muscle spasms. Assuming this is true, however, a claimant must also prove the second prong to qualify for benefits under section 1.05c. *Reynolds*, 844 F.2d at 455; *Nunn v. Bowen*, 828 F.2d 1140, 1144 (6th Cir.1987). Even Scott admits, however, that "[t]here are a good

number of notations in the record of examinations by doctors that [Scott] did not have any sensory loss ... [or] reflex loss." Scott argues, however, that we cannot be sure because the medical records are confusing and no definitive medical opinion directly addresses the point.

There was sufficient evidence in the record, however, for the ALJ to determine that Scott had *no* sensory or motor loss, and thus that he did not qualify under section 1.05c. On May 28, 1986, Dr. Szmanda wrote Dr. Beuchel and informed him of the results of various tests he had conducted on Scott. These tests revealed, among other things, that a "[s]ensory examination was normal to pinprick, light touch, sharp/dull discrimination, proprioception, vibration, stereognosis, and graphesthesis." This evidence supports a finding that Scott failed to demonstrate that he suffered from one of the requirements under section 1.05c.

Further, as the Secretary argues, the ALJ's finding of noneligibility is also supported by a number of "negative inferences" evident from a review of the record. For example, the Secretary points out that Scott's counsel asked Dr. Szmanda for a direct opinion whether Scott met the requirements of section 1.05c. Dr. Szmanda declined to give his opinion, however, which suggests that Scott failed to meet the listing. In addition, Dr. Beuchel was given the specific listing and its requirements, but stated, in essence, that Scott met only the first requirement of section 1.05c. Given our often-repeated observation that treating physicians may occasionally "go the extra step in helping their patients obtain benefits for a medical condition," *De-Francesco v. Bowen*, 867 F.2d 1040, 1043 (7th Cir.1989) (citing *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir.1985)), the refusal of either of Scott's treating physicians directly to substantiate Scott's claim that he met section 1.05c further supports the ALJ's determination that Scott was not eligible for disability benefits.

---

3. Since we hold that Scott's argument is not supported factually, we do not reach the argument pressed by the Secretary that Scott waived any right to have a medical advisor's opinion admitted into evidence when Scott's counsel asked the ALJ to close the record and render a decision without requesting such an opinion.

Finally, Scott argues that there is "no opinion by any doctor" specifically holding that Scott "meets or does not meet or equals or does not equal any of the listings, especially 1.05C." The Secretary points out, however, that a disability examination by a state agency physician on November 4, 1986 (two months after Scott filed for benefits) resulted in a finding that Scott failed to meet any of the listings in question (including section 1.05c) and that he was not eligible for benefits.[4] Since the state agency physician was a physician designated by the Secretary to determine medical equivalence, the ALJ may rely upon the physician's opinion to determine eligibility. *Waite v. Bowen,* 819 F.2d 1356, 1360 (7th Cir.1987).[5] Thus, this opinion further supported the ALJ's decision that although Scott may have had a "severe impairment," it was not so severe as to prevent Scott from doing light or sedentary work.[6]

### III.

The opinion of the ALJ was supported by substantial evidence and is therefore

AFFIRMED.

---

4. The opinion of a doctor that a claimant "is disabled for purposes of Social Security" need not be accepted if there is contradictory evidence suggesting nonqualification. *Steward v. Bowen,* 858 F.2d 1295, 1299 (7th Cir.1988); *Waite v. Bowen,* 819 F.2d 1356, 1359 (7th Cir. 1987). Thus, Dr. Beuchel's comment that Scott was totally disabled for purposes of Social Security need not have been heeded given the conflicting evidence.

5. Scott also argues that SR 83–19, which requires an ALJ to admit as expert opinion evidence the medical judgment of a physician des-

ignated by the Secretary, is unconstitutional and should be held invalid. Since we find that substantial evidence in the record (besides the state physician's report) supports the decision of the ALJ, we need not and do not reach this argument.

6. Further support could be found in the testimony of the claimant himself. Scott testified that he still had the capacity to help out around the house, carry groceries, set the table, ride a bike, and go hunting and fishing.