**Leletta OTTMAN, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**Civil Action No. 3:03–CV–0217.**

United States District Court, N.D. Indiana, South Bend Division.

Feb. 17, 2004.

Order on Motion to Alter or Amend March 3, 2004.

Carter Zerbe PHV, Charleston, WV, for Plaintiff.

Clifford D. Johnson, U.S. Attorney's Office, South Bend, IN, for Defendant.

### MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

This is an action for judicial review of Defendant's final decision that Plaintiff, Leletta Ottman, ("Ms. Ottman") was not entitled to a period of disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, as

amended. *See* 42 U.S.C. §§ 416(i), 423(d). Ms. Ottman filed her application for benefits on July 13, 1999, alleging that she had been unable to work since March 16, 1999, due to back and hand pain, headaches, blurred vision, and her "nerves" (Tr. 63–65, 359). After the agency denied her application initially and on reconsideration, Ms. Ottman requested a hearing before an Administrative Law Judge (ALJ) (Tr. 46–47, 57–58).

On March 1, 2001, Ms. Ottman, represented by counsel, and a vocational expert testified before the ALJ (Tr. 350–89). In a decision dated May 1, 2001, the ALJ found Plaintiff not disabled because she could perform her past relevant work as a telephone solicitor, or alternatively, a significant number of other jobs (Tr. 21–35). The Appeals Council's denial of Ms. Ottman's request for review left the ALJ's decision as the final decision of the Commissioner. *See* 20 C.F.R. § 404.981. Ms. Ottman now seeks judicial review pursuant to 42 U.S.C. § 405(g).

## I. Background

### A. Hearing Testimony

Ms. Ottman was born in 1955. She was forty-five years old at the time of the ALJ's decision, and thus, considered a "younger individual" as defined under the regulations. 20 C.F.R. § 404.1563(c) (Tr. 31). She had a GED and past relevant work experience as a telephone solicitor, peddler, greenhouse laborer, and carpet sewer (Tr. 353–57). Ms. Ottman testified that she stopped working in March 1999 due to back and hand pain, headaches, blurred vision, and her "nerves" (Tr. 353, 357, 359, 367). Ms. Ottman additionally stated that her hands hurt if she used them too much (Tr. 367). Heat and humidity accentuated her breathing problems, which she had due to a history of smoking (Tr. 369).

Ms. Ottman also had a history of headaches, which would last for two or three days and made her sick to her stomach (Tr. 357–70). Ms. Ottman stated that she injured her back at work when a chair was pulled out from under her, causing her to hit her shoulders on a metal cabinet and land her buttocks on a concrete floor (Tr. 358). Ms. Ottman stopped working after this accident because she could not ride in her car long enough to get to work without her back hurting (Tr. 364).

At the time of the hearing, she saw Dr. Holley at a pain clinic every two weeks (Tr. 362–63). Dr. Holley prescribed pain medication for her back and BuSpar and Paxil for her depression, but she averred that the medicines made her "drowsy" (Tr. 365). When questioned on her alleged mental impairment, Ms. Ottman said that, other than the state agency psychologist consultations, she had not been to a psychologist, but she was hospitalized for depression in October 1998, which was prior to her alleged onset date (Tr. 358–59).

Ms. Ottman stated that she slept 90% of the time during a typical day (Tr. 365). She did no household activities (Tr. 365, 368). She stated she did not go out except to see the doctor every two weeks (Tr. 366). Sitting or standing in one place for more than ten minutes exacerbated her pain and required walking around for relieve of her symptoms (Tr. 366, 369). Ms. Ottman stated she could not squat, bend, or lift more than seven pounds (Tr. 367–68).

### B. Medical Evidence

#### i. Physical

On March 8, 1999, Ms. Ottman went to the emergency room with complaints of lower back pain (Tr. 157–58). A chair had been pulled out from under her at work causing her to land on her tailbone and hit her shoulder and back (Tr. 157–58). X-rays taken in the emergency room showed mild degenerative changes, spurring at

L3–4, and mild disc space narrowing at L5–S1 (Tr. 157–59). She was negative for headache, blurred or double vision, or neck pain (Tr. 157).

Ms. Ottman denied problems with her mental status, but reported that since her hysterectomy she needed nerve pills (Tr. 157). The attending physician diagnosed Ms. Ottman with acute lumbar sprain and released her with prescribed Motrin and instructed her to rest and remain off work for three days (Tr. 156–58). A subsequent MRI taken on March 16, 1999, revealed degenerative changes at L1–2, L5–S1, mild degree of spinal stenosis at L1–2, L2–3, and L3–4, and mild facet arthropathy (Tr. 160).

Ms. Ottman saw Danny R. Westmoreland, D.O., following her release at the hospital to discuss her test results (Tr. 167). She continued to complain of back pain and the physician recommended both oral medications and physical therapy (Tr. 167). Ms. Ottman returned to Dr. Westmoreland approximately every two weeks from March–May 1999 reporting no improvement of her symptoms (Tr. 165–67).

Dr. Westmoreland referred Ms. Ottman to Daniel Black, D.O. (Tr. 176–77, duplicates at Tr. 303–06). Dr. Black saw Ms. Ottman in May 1999 (Tr. 175). She reported that her thoracic and lumbar symptoms were improving, but her tailbone symptoms continued (Tr. 175). Ms. Ottman told Dr. Black that she could stand for 5 minutes, sit for 15 minutes, lift 10 pounds, and walk 10 minutes (Tr. 177). She had no compromise in her activities of daily living, but some compromise in her sport recreation (Tr. 177).

On examination, Dr. Black's impressions were thoracolumbar strain, coccydynia traumatic in nature, questionable occult fracture at the coccyx (tailbone), and questionable sciatica (Tr. 177). The physician recommended electromyography (EMG),

pain medication, manipulative therapy, and steroid injections (Tr. 176–77).

Later that month, June 1999, Ms. Ottman reported increased symptoms following manipulation (Tr. 175). Dr. Black recommended pain medications and use of a U-shaped pillow (Tr. 175). The physician questioned whether Ms. Ottman had a secondary gain intention and recorded in his treatment notes that, contrary to her complaints and examination, Ms. Ottman was seen ambulating in the hall without difficulty and his office staff apparently "watched her in the parking lot, [noting that she] easily got in and out of her car" (Tr. 175). At a following visit later that month, Dr. Black again noted Ms. Ottman's ability to ambulate better in the parking lot rather than the office (Tr. 175).

A July 1999 EMG was normal and showed no evidence of radiculopathy (Tr. 173–74). Dr. Black's impressions were coccydynia, and sciatic pain referred, but not true neurologic in nature (Tr. 174). In August 1999, Dr. Black referred Ms. Ottman to Robert Lowe, M.D., for a second opinion (Tr. 178–80). The physician reviewed the medical evidence, noting that Ms. Ottman's lumbar spine MRI showed no major abnormality and x-rays of the coccyx showed normal alignment (Tr. 178).

On examination, Ms. Ottman's reflexes were intact and sitting straight leg raising was negative (Tr. 179). Dr. Lowe noted Ms. Ottman reported pain when lying down and she was able to flex forward 60–70 degrees without pain symptoms (Tr. 179). Dr. Lowe saw no indication of chronic orthopedic interference and recommended that Ms. Ottman perform abdominal exercises for strengthening (Tr. 178–80).

Ms. Ottman saw Robert Holley, M.D., approximately once a month from August 1999 to February 2001 (Tr. 207–27, 259–77). In August 1999, Ms. Ottman reported

lower back pain associated with a March 1999 work-related incident (Tr. 227). During this and subsequent office visits, Dr. Holley described Ms. Ottman as being in no acute distress with an antalgic gait and some back spasm (Tr. 207–27, 259–77). She had difficulty rising from a sitting position, moderate difficulty with heel-toe walk, and could perform minimal squatting without assistance (Tr. 207–27, 259–77). Dr. Holley prescribed oral medication (Tr. 207–287, 259–77).

In October 1999, Dr. Holley obtained a lumbar spine x-ray which revealed degenerative changes at L3–4 and the physician diagnosed lumbar strain and sprain (Tr. 211, 220). A July 2000 MRI revealed minimal disc bulging with mild degenerative changes but no herniation (Tr. 268). In February 2001, Dr. Holley completed a residual functional capacity questionnaire (Tr. 248–56). The physician expressed the opinion that Ms. Ottman would experience pain during two-third's of a 3–hour day (Tr. 248). He also noted that she could walk 1–2 city blocks; continuously sit or stand at one time for up to 15 minutes; sit and stand/walk 2 hours in an 8–hour day; walk around every 10 minutes; require the option to shift positions at will; and would need unscheduled breaks during the day, resting 10 minutes before returning to work (Tr. 248–49). In addition, Ms. Ottman could never lift more than 11 pounds, but could occasionally lift 1 to 10 pounds (Tr. 250). Dr. Holley also opined that Ms. Ottman had slightly limited to moderately limited mental restrictions (Tr. 253–55).

Bernard Nolan, M.D., examined Ms. Ottman for Workers Compensation in October 1999 (Tr. 293–302, duplicated pages at Tr. 204–06). Dr. Nolan observed that Ms. Ottman's MRI and X-rays revealed mild degenerative disc disease with no disc herniation, not related to the injury, and that an EMG was normal (Tr. 205). On examination, Dr. Nolan observed that Ms. Ottman moved about the examination room with little difficulty and that she was able to get on and off the examination table without assistance (Tr. 295). She had straight leg raising with both lower extremities to 90 degrees and some mild diminished flexion (Tr. 295, 298). She could toe walk, heel walk, semi-squat, and her reflexes were normal (Tr. 295, 298). The physician noted vertebral tenderness with no paraspinal muscle tenderness or spasm (Tr. 297). Ms. Ottman had no difficulty with gait (Tr. 297). Dr. Nolan diagnosed coccydynia and concluded that Ms. Ottman was not capable of returning to her previous occupation at said time (Tr. 206). The physician further indicated that she retained the capacity to lift 10 pounds and frequently lift and/or carry 10 pounds; stand and/or walk unlimited; sit less than 3 hours in an 8–hour day; and occasionally climb, balance, stoop, kneel, crouch, crawl and bend (Tr. 296).

### ii. Mental

In September 1999, Gary Sarver, Ph.D., examined Ms. Ottman at the request of the state agency (Tr. 184–89). She reported difficulty falling asleep because she "thinks a lot" and heard "noises" (Tr. 185). She cries seven days a week about the "kids and the bills get to her" (Tr. 185, 187). She felt that she could not work at the present time because she could not sit or stand very long (Tr. 185, 187). Following testing, Dr. Sarver noted that Ms. Ottman would be likely to exaggerate her physical and psychological distress for secondary gain (Tr. 188). The psychologist diagnosed pain disorder and felt that she was depressed due to her current life situation (Tr. 188). Dr. Sarver concluded that Ms. Ottman retained the ability to understand, remember, and carry out simple one- and two-step job instructions, but her ability to interact with supervisors, co-workers, and the public appears variable (Tr. 188).

The following month, October 1999, John S. Waddell, Ph.D., reviewed the medical evidence at the request of the state (Tr. 191–203). Dr. Waddell concluded that Ms. Ottman would have some difficulty functioning with others in a work setting and would do better with tasks that did not require much social interaction, because she was sensitive to criticism and preoccupied with her symptoms (Tr. 193). Dr. Waddell also concluded she had the cognitive capacity to complete a variety of tasks, but her concentration and persistence were reduced due to her focus (Tr. 193). A second psychologist reviewed the medical evidence of record (Tr. 230–42). Although he rated Ms. Ottman's "B" criteria slightly more severe than Dr. Waddell (slight to *moderate v. moderate* ), the psychologist appeared to generally agree with Dr. Waddell's conclusions (Tr. 230–40).

In February 2001, Sheila Kelly, M.A., examined Ms. Ottman at the request of her attorney (Tr. 278–92). Ms. Ottman provided a medical history and reported being continually stressed, worried, and anxious (Tr. 278–82). She reported taking her medications and spending as much time as possible sleeping (Tr. 282). Following examination, Ms. Kelly diagnosed major depressive disorder, recurrent; anxiety disorder, not otherwise specified; and dependent and avoidant personality traits (Tr. 286). Ms. Kelly concluded that Ms. Ottman was not significantly limited intellectually, but physically was not capable of sitting and working at a sewing machine for any extended period of time (Tr. 286). Ms. Kelly further noted that Ms. Ottman's depression and anxiety was marked and "she did not appear to respond well to her medications although she had no ongoing psychiatric care" (Tr. 286). In an RFC accompanying her report, Kelly stated that Ms. Ottman would be "moderately" limited in her ability to understand and remember detailed instructions and to set out realistic goals (Tr. 290–91).

## C. Vocational Expert Testimony

The ALJ asked the vocational expert to consider a hypothetical individual with Ms. Ottman's age, education, and prior relevant work experience with an RFC for lifting no more than 20 pounds with restrictions of no repetitive twisting and bending, and no climbing, crawling, or squatting (Tr. 374–75). The ALJ also indicated that such an individual needed to change positions every 30–45 minutes at least every 30 minutes so as to avoid cramping (Tr. 375). The vocational expert testified that such an individual with Ms. Ottman's vocational profile and the above-mentioned limitations could perform her past relevant work as a telephone solicitor, which was sedentary, semi-skilled (Tr. 375).

The ALJ then asked the expert whether an individual with the above-mentioned limitations who additionally was allowed to sit or stand at will, but limited to low-stress work (e.g., no dealing directively with the general public, no production quotas, or over-the-shoulder supervision), could perform Plaintiff's past work as a telemarketer (Tr. 375). The vocational expert responded that such an individual could not perform Plaintiff's past work as a telemarketer, but nevertheless, the individual retained the ability to perform over 8,000 unskilled jobs at the light level and 5,000 sedentary jobs (Tr. 376).

## D. The ALJ's Decision

After considering the evidence of record, the ALJ conducted the five step sequential evaluation set forth at 20 C.F.R. § 404.1520(a). The ALJ first found that Ms. Ottman had not engaged in substantial gainful activity since her alleged onset date (Tr. 27). *See* 20 C.F.R. § 404.1520(b). At steps two and three of the sequential evaluation process, the ALJ found that Ms. Ottman had a severe impairment(s), but

determined that none of these impairments met or equaled one described in the Listing of Impairments (Tr. 27). *See* 20 C.F.R. § 404.1520(c)-(d). The ALJ then determined Ms. Ottman's residual functional capacity (RFC-what one can do in spite of his or her impairments-20 C.F.R. § 404.1545), finding that she retained the capacity to perform a reduced range of medium work with restrictions from repetitive twisting or bending, and no frequent climbing, crawling, or squatting, but allowed her to alternate between sitting and standing, as needed, every 30–45 minutes (Tr. 28–29). *See* 20 C.F.R. § 404.1520(e). This Court will not second-guess the ALJ's RFC determination as there is substantial evidence in the record supporting such determination.

At step four, the ALJ compared Ms. Ottman's RFC to her past relevant work and found that she could, based on the vocational expert testimony, perform her past sedentary-level job as a telephone solicitor, which did not require the performance of work-related activities precluded by the limitations listed above (Tr. 30). *See* 20 C.F.R. § 404.1520(e). The ALJ alternatively found at step five that if Ms. Ottman retained the above-mentioned limitations, but additionally was allowed to sit or stand at will, but limited to low-stress work (e.g., no dealing directively with the general public, no production quotas, or over-the-shoulder supervision), she was not precluded from performing other work because, based on the vocational expert testimony, a significant number of other jobs existed in the national economy which she could perform (Tr. 32). *See* 20 C.F.R. § 404.1520(f). The Defendant argues therefore that substantial evidence exists that supports the ALJ's decision that Ms. Ottman was not disabled.

## II. Standard of Review

This court's review of the Commissioner's decision is a limited one. Unless there is an error of law, the court will uphold the Commissioner's findings of fact if they are supported by substantial evidence. *Griffith v. Callahan*, 138 F.3d 1150, 1152 (7th Cir.1998). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 399–400, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). In making a substantial evidence determination, the court will review the record as a whole, but will not reevaluate the facts, re-weigh the evidence or substitute its own judgment for that of the Commissioner. *Griffith* 138 F.3d at 1152; *Brewer v. Chater*, 103 F.3d 1384, 1391 (7th Cir.1997). That being said, the ALJ must "build an accurate and logical bridge between the evidence and the result." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir.2000).

 With respect to credibility determinations, the ALJ is in the best position to observe the demeanor and veracity of the testifying witnesses. *Griffith* 138 F.3d at 1152. The court will not disturb the ALJ's weighing of credibility so long as those determinations are based on some support in the record and are not "patently wrong." *Id.; Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir.1994). However, the district court is required to critically review the evidence and not simply rubber-stamp the Commissioner's decision. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir.2000).

## III. DISCUSSION

 "Benefits are available only to those individuals who can establish disability under the terms of the Social Security Act." *Estok v. Apfel*, 152 F.3d 636, 638 (7th.Cir.1998). Under section 423(c)(1)(B)(1), it is well established that to receive benefits, a disability must have begun or had its inception during the period of insured status. *Bastian v. Schweik-*

*er,* 712 F.2d 1278, 1280 (8th Cir.1983); *Demandre v. Califano,* 591 F.2d 1088, 1090 (5th Cir.), *cert. denied,* 444 U.S. 952, 100 S.Ct. 428, 62 L.Ed.2d 323 (1979). The Seventh Circuit has established that a claimant has the burden of establishing that she is disabled within the meaning of the Social Security Act on or before the date her insured status expired. *Estok v. Apfel,* 152 F.3d 636, 640 (7th Cir.1998); *Meredith v. Bowen,* 833 F.2d 650 (7th Cir. 1987); *Owens v. Heckler,* 770 F.2d 1276, 1280 (5th Cir.1985); *Garner v. Heckler,* 745 F.2d 383, 390 (6th Cir.1984); *Jeralds v. Richardson,* 445 F.2d 36, 39 (7th Cir. 1971). "The law requires that a claimant demonstrate her disability within the proscribed period of eligibility not prior to or subsequent to the dates in question." *Jeralds,* 445 F.2d at 39. Therefore, "any condition that had its onset or became disabling after plaintiff's insured status expired may not be used as a basis for entitlement to disability benefits." *Couch v. Schweiker,* 555 F.Supp. 651, 654 (N.D.Ind.1982). Plaintiff bears the burden of showing through testimony and medical evidence supported by clinical data and laboratory diagnosis that he was disabled during the period in which he was insured. *Jeralds,* 445 F.2d at 38–39; See also *Reading v. Mathews,* 542 F.2d 993, 997 (7th Cir.1976).

The claimant must show that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The regulations to the Act create a five-step inquiry in determining whether a claimant is disabled. As previously discussed, the ALJ must consider the applicant's claim in the following sequence:

(1) whether the claimant is currently employed; (2) whether she has a severe impairment; (3) whether her impairment meets or equals one listed by the Secretary; (4) whether the claimant can perform his past work; and (5) whether the claimant is capable of performing any work in the national economy. *Clifford,* 227 F.3d at 868; citing *Knight v. Chater,* 55 F.3d 309, 313 (7th Cir.1995). "An affirmative answer leads either to the next step, or on Steps 3 and 5, to a finding that the claimant is disabled. *Clifford,* 227 F.3d at 868. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford,* 227 F.3d at 868. The initial burden in steps one through four is on the plaintiff; only at step five does the burden shift to the Commissioner. *Id.*

### A. Treating Physician

 In support of her claim, Ms. Ottman challenges the weight the ALJ assigned the opinions of her treating physician, Dr. Holley. The treating physicians' opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. *Zurawski v. Halter,* 245 F.3d 881, 889 (7th Cir.2001). Further, under the Social Security regulations, an ALJ must consider every medical opinion he receives. 20 C.F.R. § 404.1527(d). In deciding what weight to give to a particular medical opinion, the ALJ must consider (1) the examining relationship, generally giving more weight to the opinion of an examining source; (2) the treatment relationship, generally giving more weight to treating sources because of their unique and long-term perspective regarding the claimant's condition; (3) the extent to which the opinion is supported by medical evidence, including medical signs and laboratory findings; (4) to what extent the opinion is

consistent with the record as a whole; and (5) whether the opinion is that of a specialist on issues relating to his or her specialty. 20 C.F.R. §§ 404.1527(d)(1)-(5), 416.927(d)(1)-(5). However, an ALJ may properly discredit the opinion of a treating physician if it is not supported by medical findings or is inconsistent with other evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir.2001); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

■ In this matter, the Defendant argues that Dr. Nolan's report, in conjunction with the record as a whole, supports the ALJ's decision to afford Dr. Holley's, Ms. Ottman's treating physician, opinions less weight. The ALJ not only considered Dr. Nolan's background in orthopedic surgery, but also considered and discussed the numerous discrepancies in regard to Ms. Ottman that existed between Dr. Nolan and Dr. Holley. Moreover, Dr. Nolan's report describing Ms. Ottman's limitations is further supported by the record as a whole, whereas Dr. Holley's limitations appear to be inconsistent with the record as a whole. The court will not disturb the ALJ's weighing of credibility so long as those determinations are based on some support in the record and are not "patently wrong." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir.1994).

### B. Ms. Ottman's Testimony

■ In further support of her argument, Ms. Ottman challenges the ALJ's credibility assessment. In particular, she contends that the ALJ failed to analyze her testimony regarding her limitations and the side-effects of medications as well as the witness testimony. Ms. Ottman, however, must establish that the ALJ's credibility determination was patently wrong. An ALJ's credibility determination is entitled to substantial deference. *Steward v. Bowen*, 858 F.2d 1295, 1302 (7th Cir.1988). The ALJ need not provide

a written evaluation of each piece of evidence or testimony. *Orlando v. Heckler*, 776 F.2d 209, 213 (7th Cir.1985). However, as long as the ALJ's determination on credibility is grounded in the record and articulates his analysis of the evidence "at some minimal level," *id.; Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir.1988), creating a logical bridge between the evidence and the result, *Shramek*, 226 F.3d at 811, his decision must be upheld unless it is "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir.2000).

In this case, the ALJ found Ms. Ottman's testimony unreliable because it was inconsistent with significant medical evidence of record. The limitations Ms. Ottman testified to were not supported by the evidence presented by the various medical experts. Further, Dr. Black as well as Dr. Sarver both commented as to Ms. Ottman's likeliness to exaggerate symptoms.

In regard to her medication, the record reveals that upon complaint by Ms. Ottman, physicians were sure to modify her medications accordingly. Lastly, the challenge to the ALJ's failure to cite to witness testimony in making his assessment is without merit. An ALJ need not provide a written evaluation of each piece of evidence or testimony. *Orlando v. Heckler*, 776 F.2d 209, 213 (7th Cir.1985). Furthermore, there is no evidence that this witness testimony conflicted with Ms. Ottman's in any way. In sum, Ms. Ottman, has not established that the ALJ's credibility finding was patently wrong, as required.

### C. Opinion of Sheila Kelly

■ Ms. Ottman also challenges the ALJ's decision contending that the ALJ failed to weigh or analyze the disability opinions of psychologist Sheila Kelly. The Defendant claims that the ALJ did in fact consider Ms. Kelly's report, however, de-

cided to rely on the state agency reviewing psychologist's opinions. The ALJ evaluated Ms. Kelly's opinions in comparison to those of the two state agency psychologist's opinions and found Ms. Kelly's opinions in regard to Ms. Ottman to be far more extreme. In fact, neither of the state agency psychologists found Ms. Ottman to be disabled. However the opinions of the two state psychologists did form additional mental limitations, finding Ms. Ottman disabled at step five rather than step four.

The regulations, and this Circuit, clearly recognize that reviewing physicians and psychologist are experts in their field and the ALJ is entitled to rely on their expertise. *See* 20 C.F.R. § 404.1527(f)(2)(i) ("State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act."); *See also, Scott v. Sullivan*, 898 F.2d 519, 524 (7th Cir. 1990). Furthermore, as long as the ALJ's determination on credibility is grounded in the record and articulates his analysis of the evidence "at some minimal level," *id.; Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir.1988), creating a logical bridge between the evidence and the result, *Shramek*, 226 F.3d at 811, his decision must be upheld unless it is "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir.2000). An ALJ's credibility determination is entitled to substantial deference. *Steward v. Bowen*, 858 F.2d 1295, 1302 (7th Cir.1988).

### D. Step 2 Analysis

Ms. Ottman additionally challenges the denial decision contending that the ALJ erred in failing to consider whether her alleged anxiety, pain disorder and coccygodnia impairments were "severe" at step two of the process. However, at step two, an ALJ is to determine whether a claimant's impairment(s), individually or in combination are "severe." 20 C.F.R. § 404.1523. The pertinent issue is whether the ALJ properly accounted for all the impairments in his listings analysis and RFC. Here, the ALJ found that Ms. Ottman's discogenic and degenerative disorders of the back and depression were "severe" at step two and then continued through step five of the sequential evaluation process. Furthermore, the ALJ concluded that even if claimant had additional functional restrictions associated with her physical impairment and even if she had a "severe" mental impairment, and even if claimant was precluded from performing her past relevant work because of such additional restrictions, she could still be expected to make a vocational adjustment to work which exists in significant numbers in the national economy and a finding of not disabled would continue to be appropriate, but at step 5 rather than step 4.

As long as a claimant has any severe impairment or combination of impairments, the ALJ must proceed beyond step two and must consider all of the impairments (including non-severe impairments) at the remaining steps of the sequential evaluation process, which in this case, was done. 20 C.F.R. § 404.1523. Ms. Ottman's assertion that the ALJ committed reversible error at step two of the sequential evaluation process is unavailing. Further, as argued by the Defendant, and in light of the analysis by the ALJ at step five, Ms. Ottman's additional argument that the ALJ failed to considered her alleged impairments in combination is further misguided.

### E. "Often" Limitation

 Lastly, Ms. Ottman challenges the ALJ's alternative step five finding which contemplated mental limitations in concentration, persistence or pace, contending that the notation of "often" on the psychi-

atric review technique form (PRTF) required an instruction of such to the vocational expert. She claims that the ALJ erred in not giving the vocational expert such restriction. Defendant argues that once an ALJ makes a finding of severity at step two and determines that the severity is not of a listing level at step three, an ALJ no longer utilizes the PRTF form, but performs an individual assessment of Plaintiff's limitations and translates them into work-related limitations (step four). 20 C.F.R. § 404.1520(a)(d)(4). In this instance, as discussed above, the ALJ made an alternative step two finding and found that if Plaintiff had a severe mental impairment, at step five, even if she was further restricted to low stress job duties, she would still be able to perform a significant number of jobs.

However, in a recent opinion, the Seventh Circuit held that "[t]he point, however, is not whether the PRTF form was literally part of the decision. It is instead whether the limitations noted in the form ... were incorporated in the hypothetical he posed to the vocational expert." *Kasarsky v. Barnhart*, 335 F.3d 539 (7th Cir. 2003). The *Kasarsky* Court held that the ALJ's failure to incorporate the limitation of *frequent* observed earlier by the ALJ, in the hypothetical posed to the vocational expert, required remand. Because the ALJ in this matter did not incorporate the limitation of "often" as observed earlier in the record, in the hypothetical posed to the vocational expert, or explain its omission, the same action of remand must be followed in this instance.

### IV. Conclusion

Based on the forgoing, the ALJ's decision is **REMANDED** for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

### MEMORANDUM AND ORDER ON MOTION TO ALTER OR AMEND

On or about February 17, 2004, this Court found that Ms. Ottman was entitled to remand. On or about March 2, 2004, the Commissioner filed a motion to alter or amend that judgment. While the Commissioner does not contest the Court's determination in its February 17, 2004 decision, she was concerned that the language articulated in that opinion could be read to suggest that ALJ's are required to incorporate their exact "B" criteria findings into their ultimate residual functional capacity findings ("RFC").

The Commissioner's concern focuses on the Court's statement that "because the ALJ in this matter did not incorporate the limitation of 'often' as observed earlier in the record, in the hypothetical posed to the vocational expert, or explain its omission, this same action of remand must be followed in this instance." Order at 16–17. This Court's statement was premised on the Seventh's Circuit's holding in *Kasarsky v. Barnhart*, 335 F.3d 539 (7th Cir. 2003). This Court, in rendering its opinion, did so in line with *Kasarsky*, having legitimate concerns about whether the ALJ's ultimate RFC finding accounted for Ms. Ottman's mental impairments. This case was remanded in order for the ALJ to provide a mental functional residual capacity findings that takes account for his earlier finding that Ms. Ottman "often" had deficiencies in concentration, persistence, and pace.

Therefore, for the sake of clarification, this matter was remanded for further consideration of that issue, and was not remanded, to require the ALJ to include his exact "B" criteria findings into his RFC findings. The opinion issued by the Court on or about February 17, 2004, ordering remand, thus allows the Court's concerns

to be addressed while confirming with the Agency's regulations. *See, Smith v. Halter,* 307 F.3d 377 (6th Cir.2001).

**SO ORDERED.**