**Gail WASHINGTON, Plaintiff,**

v.

**Michael J. ASTRUE, Commissioner of Social Security, Defendant.**

C/A No. 3:08–CV–02631–DCN–JRM.

United States District Court,
D. South Carolina,
Charleston Division.

March 17, 2010.

Nowell Stanley Lesser, Charleston, SC, for Plaintiff.

Beth Drake, U.S. Attorneys Office, Columbia, SC, for Defendant.

## ORDER & OPINION

DAVID C. NORTON, Chief Judge.

This matter is before the court on Magistrate Judge Joseph McCrorey's report and recommendation, made in accordance with 28 U.S.C. § 636(b)(1)(B), that this court reverse the decision of the Commissioner denying plaintiff's application for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 410–33, 1381–83. Defendant has filed written objections to the report and recommendation. For the reasons set forth below, the court adopts the report and recommendation of the magistrate judge and reverses and remands the case for further consideration by the Commissioner.

## I. BACKGROUND

Plaintiff first filed for DIB and SSI in March 2006 alleging she became disabled on January 1, 2005, due to low back pain, arthritis in her knees and ankles, high blood pressure, carpal tunnel syndrome, obesity, and depression. Tr. 89. Her application was denied initially and upon reconsideration. Tr. 49–51, 53–57, 60–65. Plaintiff requested an administrative hearing, which was held on October 15, 2007. Tr. 32–48. On November 9, 2007, the administrative law judge (ALJ) issued a decision finding plaintiff was not disabled within the meaning of the Social Security Act. Tr. 22–31. On May 28, 2008, the Appeals Council rendered the Commissioner's determination final when it denied plaintiff's request to review the ALJ's decision. Tr. 2–6.

Plaintiff was born on July 16, 1960. Tr. 35. She has a ninth grade education and worked in the past as a cook and tomato sorter. Tr. 35, 38, 96–97, 100. Plaintiff initially alleged disability beginning January 1, 1992. Tr. 22. The record shows that claimant's disability onset date was amended to January 1, 2005. Tr. 22. Plaintiff alleges that she became disabled due to multiple symptoms, including low back pain, arthritis in her knees and ankles, high blood pressure, carpal tunnel syndrome, obesity, and depression. Tr. 95. Plaintiff, who is currently represented by counsel, was unrepresented at the hearing before the ALJ. Tr. 35.

Plaintiff's medical evidence in the record relates primarily to the treatment provid-

ed to plaintiff at the Medical University of South Carolina (MUSC) over a period of approximately thirteen years. Plaintiff had surgery on her left ankle in April 1994. Tr. 189–91. Plaintiff underwent surgery for a trimalleolar left ankle fracture consisting of open reduction with internal fixation using interfragmentary screws. Tr. 189–91. Plaintiff was seen in September 1996 for a left knee injury caused by a fall. Tr. 182. X-rays revealed an accessory ossification center at the tibial tuberosity. Tr. 182. In 1997, x-rays of plaintiff's chest showed "mild cardiomegaly" (enlarged heart) and spondylosis (degenerative changes) at thoracolumbar (mid-to-low back) junction. Tr. 177. In January 2001, plaintiff's chest x-rays showed an enlarged cardiac silhouette with prominent soft tissue density and no pulmonary infiltrates. Tr. 171. In March 2001, plaintiff underwent surgery at MUSC consisting of an open cholecystectomy due to chronic cholecystitis. Tr. 166–70.

On March 2, 2006, plaintiff was treated by Anne Anderson, M.D., at James Island Family Practice. Plaintiff complained of headaches and numbness and tingling in her hands. Tr. 197. Dr. Anderson diagnosed hypertension, tachycardia (fast heart rate), numbness in the upper extremities, headaches, and obesity. Tr. 197.

On March 3, 2006, plaintiff was treated at the MUSC emergency room with complaints of pain in her right hand. Tr. 147–48. Examination of her hands showed Tinel's and Phalen's signs, indicative of carpal tunnel syndrome. Tr. 147–48. The physician diagnosed carpal tunnel syndrome and prescribed a wrist splint and pain medication. Tr. 147–48. Plaintiff returned three days later with complaints of bilateral hand and wrist pain. Tr. 145–46. The physician diagnosed carpal tunnel syndrome and again prescribed a left wrist splint and pain medications. Tr. 145–46.

Plaintiff was seen again in January 2007 at the MUSC emergency room due to shortness of breath and cough with pleuritic chest pain. Tr. 236–44. She was given medication and sent home after being examined by a physician. Tr. 236–44. She returned to the ER several days later for the same symptoms. Tr. 252–67. Plaintiff was admitted to the hospital on January 8, 2007, and was discharged the following day with diagnoses of pulmonary edema, hypertension, and possible obstructive sleep apnea. Tr. 277–78. On May 21, 2007, plaintiff sought treatment at the MUSC emergency room due to shortness of breath and chest pain. Tr. 332–33. Plaintiff's chest x-ray revealed mild pulmonary edema, while a myocardial perfusion scan was reported to be normal. Tr. 381–83. An EKG showed normal sinus rhythm with sinus arrhythmia and some nonspecific T-wave abnormalities. Tr. 382. A stress test revealed sinus tachycardia with no ischemic changes. Tr. 382. The final report in the record from MUSC indicates that plaintiff went to the ER again for chest pain on August 8, 2007, and an x-ray revealed bilateral lower lobe patchy opacification likely due to pulmonary adema. Tr. 403.

Plaintiff underwent a sleep study at MUSC on February 7, 2007. Tr. 326–27. She was reported to have demonstrated severe life threatening sleep apnea with severe desaturations to 46% which required emergency CPAP application. Tr. 326–27. Plaintiff was diagnosed with "Severe Obstructive Sleep Apnea/Hypopnea Syndrome." Tr. 326.

Plaintiff was examined by Dr. Barry L. Weissglass on November 22, 2006, in conjunction with her application for disability benefits. Tr. 227. According to Dr. Weissglass' examination, plaintiff was positive for some crepitus on passive range of motion testing of both knees, as well as for

pain on manipulation of the left ankle, with decreased range of motion "especially in dorsiflexion and eversion." Tr. 228. Dr. Weissglass noted that she had negative Tinel and Phalen signs on that day. Tr. 228.

Dr. Weissglass assessed plaintiff with arthritis of her knees and left ankle, uncontrolled hypertension, carpal tunnel syndrome, obesity and tachycardia. Tr. 229. Dr. Weissglass did note that his assessment of plaintiff's carpal tunnel syndrome was based on plaintiff's history of nerve conduction studies, although the exam on that date was negative. Tr. 229. He opined that plaintiff should be limited from repetitive lifting, walking, prolonged standing, bending, and kneeling. Tr. 229. With regard to her hypertension and tachycardia, Dr. Weissglass stated that plaintiff's limitations were unclear since he did not have objective data available. Tr. 229. He stated that until such information was available, it would be important for plaintiff to avoid activities that required significant aerobic involvement and should limit her activity level significantly. Tr. 229. Lastly, he noted that plaintiff's headaches and obesity should not significantly limit her ability to work except that jobs should not require her to be particularly agile. Tr. 229.

George Chandler, M.D., a state agency physician, reviewed the evidence in December 2006, and concluded that plaintiff could lift/carry fifty pounds occasionally and twenty-five pounds frequently; sit or stand/walk about six hours each in an eight-hour workday; frequently balance; occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; and never climb ladders, ropes, or scaffolds, and that she should avoid "constant" handling and fingering.[1] Tr. 219–26. Also in December

2006, Jeffery Vidic, Ph.D., a state agency psychologist, reviewed the evidence and found that plaintiff had only mild limitations in daily activities, social functioning, and concentration, and had no extended episodes of mental decompensation. Tr. 205–18.

An administrative hearing took place on October 15, 2007. Tr. 32. Plaintiff testified that she was five feet six inches tall and weighed 317 pounds. Tr. 39. She said she received most of her treatment from the emergency rooms at MUSC and Roper St. Francis Healthcare (Roper) because she did not have medical insurance. Tr. 39. Plaintiff testified that she had to go to MUSC in January 2007 for problems with her heart and blocked arteries, where she stated they kept her for over a week and put her on medication. Tr. 6–7. She said she tried to "stretch out" her medications by taking them "every other day." Tr. 39. She stated that she worked for short periods of time in 2005 and 2006, and that she stopped working at her job sorting tomatoes after two months because she was not allowed to sit down. Tr. 36–37. Plaintiff testified that she could not go back to work as a cook due to numbness, pain, and swelling in her legs and hands. Tr. 42. She testified that she could not perform a sitting job because she had numbness from her leg up to her hip. Tr. 42–43. Arthur Schmitt, a vocational expert, testified that plaintiff had past work as a cook and tomato sorter, and that both of these jobs were performed in a standing position. Tr. 46–47. Plaintiff stated that her doctors instructed her to keep her leg elevated and not to stand for prolonged periods. Tr. 43–44. She further testified that Dr. Weissglass told her not to stand at all. Tr. 44.

---

1. "Handling" is defined as "gross manipulation," while "fingering" is defined as "fine manipulation." Tr. 222.

Plaintiff testified that she had arthritis in her knees and needed a "knee replacement." Tr. 38. She testified she also had carpal tunnel syndrome and problems with her ankles. Tr. 38. Plaintiff testified that she had most recently sought treatment for her heart at MUSC and had been hospitalized for over a week in January 2007. Tr. 39–40. Plaintiff stated she also sought treatment for similar complaints at Roper but had not been admitted. Tr. 39–40. Plaintiff testified that since 2007 she took heart and blood pressure medications and used a CPAP machine for sleep apnea.

At the end of the administrative hearing, the ALJ stated, "I don't have all the records, okay? The reason I don't have all the records is because you were hospitalized in January of this year. I don't have those records, okay? And obviously, if you went to Roper at all, I don't have those records as well." Tr. 41–42. The ALJ then stated, "I will have to, after this hearing is over, contact MUSC, and contact Roper. I will update the treatment records for you this year. After I've gotten all those records, I will make a decision, okay?" Tr. 41–42.

The ALJ applied the five-step sequential evaluation process for determining whether an individual is disabled in accordance with the Social Security Act. Tr. 19–31. First, the ALJ determined that plaintiff met the insured status requirements of the Social Security Act through December 31, 2009. Tr. 24. At the first step, the ALJ found that plaintiff had not engaged in substantial gainful activity since January 1, 2005. Tr. 24. At step two, the ALJ found that plaintiff had the severe impairments of obesity, tachycardia, and carpal tunnel syndrome. At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appendix 1. Tr. 24–26. The ALJ found

that plaintiff had the residual functional capacity (RFC) to sit for six hours of an eight hour day; stand/walk for two hours of an eight hour day; frequently lift/carry light items; and occasionally lift ten pounds. Tr. 26. At step four, the ALJ determined that plaintiff was unable to perform any of her past relevant work. Tr. 30. At step five, the ALJ found that considering plaintiff's age, education, work history, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she could perform. Tr. 30. Consequently, the ALJ found that plaintiff was not under a "disability" as defined in the Social Security Act from January 1, 2005, through the date of the decision. Tr. 30.

## II. STANDARD OF REVIEW

 This court is charged with conducting a de novo review of any portion of the magistrate judge's report to which a specific, written objection is made. 28 U.S.C. § 636(b)(1). A party's failure to object is accepted as agreement with the conclusions of the magistrate judge. *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). This court is not required to review, under a de novo standard, or any other standard, the factual findings and legal conclusions of the magistrate judge to which the parties have not objected. *See id.* at 149–50, 106 S.Ct. 466. A party's general objections are not sufficient to challenge a magistrate judge's findings. *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505, 508–09 (6th Cir.1991). The recommendation of the magistrate judge carries no presumptive weight, and the responsibility to make a final determination remains with this court. *Mathews v. Weber*, 423 U.S. 261, 270, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976). This court may accept, reject, or modify the report of the magistrate judge, in whole or in part, or may recommit the

matter to him with instructions for further consideration. 28 U.S.C. § 636(b) (1).

Although this court reviews the magistrate judge's recommendation de novo, judicial review of the Commissioner's final decision regarding disability benefits "is limited to determining whether the findings of the [Commissioner] are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" has been defined as,

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Id.* (internal citations omitted). "[I]t is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the [Commissioner] if his decision is supported by substantial evidence." *Id.* Instead, when substantial evidence supports the Commissioner's decision, this court must affirm that decision even if it disagrees with the Commissioner. *Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir.1972). "Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." *Hays,* 907 F.2d at 1456.

### *III. DISCUSSION*

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations establish a sequential evaluation process to determine whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. Under this process, the ALJ must determine, in sequence: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether that severe impairment meets or equals an illness contained in 20 C.F.R. Part 4, Subpart P, Appendix 1, which warrants a finding of disability without considering vocational factors; (4) if not, whether the impairment prevents him or her from performing past relevant work; and (5) if so, whether the claimant is able to perform other work considering both his remaining physical and mental capabilities (defined as Residual Functional Capacity or "RFC") and his vocational capabilities (age, education, and past work experience) to adjust to a new job. *Hall v. Harris,* 658 F.2d 260, 264–65 (4th Cir. 1981). *see also Pass v. Chater,* 65 F.3d 1200, 1203 (4th Cir.1995) (quoting 20 C.F.R. § 416.920). The applicant bears the burden of production and proof during the first four steps of the inquiry. *Pass,* 65 F.3d at 1203 (citing *Hunter v. Sullivan,* 993 F.2d 31, 35 (4th Cir.1992)). If the sequential evaluation process proceeds to the fifth step, the burden shifts to the Commissioner to show that other work is available in the national economy that the claimant should perform. *Id.; see also Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (discussing burden of proof).

### *A. Failure to Develop the Record*

The magistrate judge found that the ALJ erred by failing to develop the record, as he did not obtain evidence plaintiff referenced in her hearing testimo-

ny. Magistrate's Recommendation and Report (cited herein as Report) at 10. It is well-established in the Fourth Circuit that a claimant, appearing pro se, is "entitled to the sympathetic assistance of the ALJ to develop the record, to assume a more active role and to adhere to a heightened duty of care and responsibility." *Crider v. Harris,* 624 F.2d 15, 16 (4th Cir.1980) (internal quotation marks and citation omitted). When presented with a pro se claimant, the ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Marsh v. Harris,* 632 F.2d 296, 299 (4th Cir.1980) (internal quotation marks and citations omitted). If the ALJ's failure to do so results in less than a "full and fair hearing of their claims," then "good cause" may exist to remand "for the taking of additional evidence." *Sims v. Harris,* 631 F.2d 26, 27 (4th Cir.1980).

The hearing transcript reveals that the ALJ was familiar with plaintiff's record, and he questioned her as to where she received medical treatment. Tr. 38–45. Plaintiff told the ALJ she received treatment from several different doctors in different emergency rooms. Tr. 39. Plaintiff specifically told the ALJ she received treatment at MUSC and Roper. Tr. 39. Following this discussion, the ALJ explained, "I don't have all the records, okay? And the reason why I don't have all the records is because you were hospitalized in January of this year. I don't have those records." Tr. 47. The ALJ continued by saying, "If you went to Roper at all, I don't have those records, as well." Tr. 47. The ALJ then clearly stated to plaintiff, "I will have to, after this hearing is over, contact MUSC, and contact Roper. I will update the treatment records for you for this year. After I've gotten all those records, I will make a decision, okay?" Tr.

47. The ALJ then explained to plaintiff that he cannot make a decision if he "does not have all of the information." Tr. 47–48. He stated again just before he closed the hearing that he would get the medical records for plaintiff. Tr. 47–48.

As the magistrate judge noted, the ALJ perceived a gap in plaintiff's treatment records, and the final transcript shows the he was partially effective in filling that gap, as there are records from MUSC dating through August 2007. Tr. 234–406. The transcript also shows that the ALJ acted on his representations quickly, as the records were received on October 15, 2007; the same day as plaintiff's hearing. Tr. 234.

Plaintiff contends that the ALJ erred in not obtaining her medical records from Roper or Sea Island Medical Clinic (SIMC), to which he referred in his disability decision. Tr. 28. Plaintiff listed Genevieve Jones (once a physician at SIMC) as her "Family Doctor," and MUSC's discharge orders instructed plaintiff to follow-up with SIMC. Tr. 236, 252, 278, 314, 333, 364, 366. The magistrate judge noted that there was an "Authorization for Release of Information" from SIMC to MUSC dated January 17, 2007, signed by plaintiff, indicating that plaintiff visited the clinic at least once during 2007. Report at 9 (citing Tr. 247, 278).

Furthermore, the ALJ realized during the hearing that plaintiff had also received treatment at Roper for her impairments. He specifically stated he would obtain her medical records from Roper. The apparent conflicts between the testimony and the MUSC records suggest that plaintiff's recollection was not accurate. The January 2007 MUSC records show that, contrary to her account, plaintiff had a three-day hospitalization secondary to pulmonary edema. Tr. 252–325. In May 2007, MUSC treated plaintiff for congestive

heart failure, but only overnight. Tr. 328–87. Plaintiff referred to a lengthy hospitalization for her "heart and a blockage in her arteries." This treatment may have occurred at Roper. Tr. 6–7.

The ALJ relied on plaintiff's seeming lack of medical care in his disability decision. He stated that there was no documentation that plaintiff "has sought treatment from anyone other than the emergency room and on one occasion at James Island Family Practice." Tr. 28. The ALJ further stated that, "there is no evidence of record that the claimant attempted to obtain low or no-cost medical care." Tr. 28. However, the magistrate judge pointed out that, "SIMC is apparently a facility that offers either free or low-cost medical care." Report at 9.

The ALJ repeated plaintiff's statement in May 2007 that she had not been to SIMC "in some time," yet MUSC's records show that plaintiff had been there approximately four months earlier. Tr. 28, 337, 247. The ALJ stated in regard to plaintiff's residual functional capacity that she "sought medical care primarily from the emergency room and has failed to follow up with additional treatment." Tr. 29. However, as the magistrate judge pointed out, MUSC's records indicate that plaintiff visited SIMC at least once for follow-up treatment. Tr. 247. The ALJ stated that none of plaintiff's treating physicians opined as to her functional limitations, but the records of her treating physicians at Roper or SIMC may include suggested functional limitations. Tr. 29.

The government contends that any arguable error in regard to the incomplete record referenced in plaintiff's hearing testimony was harmless. Furthermore, the government argues that although the ALJ has a duty to develop the record, the burden of proving disability and the risk of non-persuasion falls on the claimant. *See Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir.1981); *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *Seacrist v. Weinberger*, 538 F.2d 1054, 1057 (4th Cir.1976). The government notes that when a party fails to present evidence which would normally be expected to support her case, that fact supports an inference that the evidence would not be favorable to her position. *See Welsh v. Gibbons*, 211 S.C. 516, 46 S.E.2d 147 (1948); *Hutchison v. Bowen*, 697 F.Supp. 1401, 1407 n. 19 (E.D.Va. 1988).

The government responded to the magistrate's recommendation by stating that "if there are additional medical records from SIMC or Roper, and if these records somehow support plaintiff's claim as she now alleges, plaintiff's counsel could have obtained them." Def.'s Br. at 18. However, the magistrate correctly noted that such an argument would appear to relieve the ALJ from any record-building duty to a pro se claimant, as he or she could always assume that a losing claimant will procure a lawyer who would then obtain the missing records. Report at 10 n. 9. Precedent clearly recognizes the ALJ's duty to develop the record for a pro se claimant. *See Marsh*, 632 F.2d at 299; *Crider*, 624 F.2d at 16.

In *Walker v. Harris*, 642 F.2d 712 (4th Cir.1981), the Fourth Circuit said remand is appropriate where the ALJ "fails diligently to explore all relevant facts especially in cases of uneducated, pro se claimants" and where nonrepresentation appears to result in prejudice. *Id.* at 714. Plaintiff's "Function Report" states that she is not a good reader or good with numbers. Tr. 121. As the magistrate judge noted, it appears that plaintiff's teenaged daughter completed most of her handwritten forms. Tr. 59, 67, 119, 200. Plaintiff had no representation to help re-

quest her medical records, and plaintiff's education is clearly limited.

The ALJ recognized the record was incomplete, and specifically stated to plaintiff that he would obtain her medical records. It is clear that all of plaintiff's medical records were not obtained by the ALJ, and he did not review all of the available evidence in making his credibility and RFC findings. For these reasons, this action will be remanded to the Commissioner to complete development of the record and to reevaluate his findings as necessary. *See Jones v. Sullivan,* 949 F.2d 57, 61 (2d Cir.1991) (finding good cause to remand pro se claimant's case when the claimant clearly "was relying on the ALJ to secure the necessary information from her treating physicians").

## B. RFC/Step Five Finding

■■■■ The government also objects to the magistrate judge's finding that the ALJ mistakenly relied on the "grids"—as opposed to consulting the vocational expert—to determine that plaintiff was not disabled. As noted above, the Commissioner bears the burden of showing the existence of a significant number of jobs in the national economy that plaintiff could perform. To aid in making this determination, the Commissioner promulgated the Medical–Vocational Guidelines (the "grids"), located at 20 C.F.R. Part 404, Subpart P, Appendix 2. *Heckler v. Campbell,* 461 U.S. 458, 461, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). Each grid, however, considers only the strength or exertional component of a claimant's disability in determining whether jobs exist that the claimant is able to perform in spite of his disability. Thus, in cases where pain occurs only upon exertion and limits one's strength functioning, the grid tables will apply. But when a claimant suffers from both exertional and nonexertional limitations, the grid tables are not conclusive but may only serve as guidelines.

*Walker v. Bowen,* 889 F.2d 47, 49 (4th Cir.1989) (citing *Wilson v. Heckler,* 743 F.2d 218 (4th Cir.1984)); *see* 20 C.F.R. § 404.1569a(d). When the Commissioner is unable to rely on the grids in making the step five determination, he must use a vocational expert to prove that jobs exist in the national economy which the claimant can perform. *Walker,* 889 F.2d at 49–50.

Plaintiff asserts that her "nonexertional impairment" results from her bilateral carpal tunnel syndrome, which the record supports as follows: MUSC diagnosis in March 2006 based on positive Phalen's and Tinel's signs; Dr. Weissglass's listing of carpal tunnel syndrome among plaintiff's diagnoses; March 2006 James Island Family Practice record noting plaintiff's complaints of numbness and tingling in both hands; plaintiff's testimony of hand swelling and numbness. Tr. 42–43, 48, 145–46, 229. Plaintiff contends that her carpal tunnel syndrome results in "manipulative limitations" that would erode the sedentary base under Social Security Ruling 96–9p, which provides, "Most unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity. Fine movements of small objects require use of the fingers; e.g., to pick or pinch. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions." *Id.*

Social Security Ruling 96–9p provides that unskilled sedentary work involves the nonexertional capacity for manipulation. It further advises that,

> Any significant manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base.... When the limitation is less significant, especially if the limitation is in

**572**

the non-dominant hand, it may be useful to consult a vocational resource.

*Id.* Thus, if plaintiff's assertions are established, the ALJ would not be able to rely on the grids to satisfy the step five burden.

The ALJ wrote that, although MUSC assessed plaintiff with carpal tunnel syndrome, there is no record that it was evaluated by an objective study. Tr. 28. The record does not support such a finding. Review of medical evidence reveals that James Island Family Practice had "consider[ed]" such a study, plaintiff told the state disability worker that her carpal tunnel syndrome treatment included a "test," and Dr. Weissglass wrote that plaintiff's carpal tunnel syndrome had been diagnosed by a nerve conduction study. Tr. 99, 198, 227. The ALJ also relied on the absence of a surgical option, but the MUSC physician *did* recommend surgery. Tr. 28, 146. The ALJ further observed that Plaintiff's hand x-rays were "generally unremarkable" (Tr. 28), but "[t]his objective finding is of little relevance because x-rays are not among the diagnostic tools typically used to evaluate carpal tunnel syndrome." *Jenkins–Dewindt v. Astrue,* 2008 WL 3889736, *7 (M.D.Fla. Aug. 20, 2008) (citing Nat'l Inst. of Neurological Disorders & Stroke, "Carpal Tunnel Syndrome Fact Sheet" (Nat'l Inst. Health, Pub. No. 03–4898, 2002)). Though the ALJ did correctly note that Dr. Weissglass failed to find either a Tinel's or Phalen's sign and deemed plaintiff's exam "negative" for carpal tunnel syndrome, the ALJ's overall misstatement of the record fails to support his decision not to believe plaintiff "regarding the extent of her limitation related to" her carpal tunnel syndrome. Tr. 28.

At step three, the ALJ determined that plaintiff's carpal tunnel syndrome had "not resulted in an inability to perform fine and gross movements effectively," referring to Listing 1.02, or "in a significant disorganization of motor function," referring to

Listing 11.00C. Tr. 26. These levels of severity, however, are not required in order for the record to establish that plaintiff suffered a manipulative limitation such that vocational testimony was required. Plaintiff's Disability Report records her complaint of constant hand pain with "no strenght [sic] to pick up anything." Tr. 96. The state agency worker who assisted with her reporting observed that plaintiff had difficulty using her hands and with writing. Tr. 103. Her daughter, Martika, explained that plaintiff's cooking habits have changed because of fear that she will "burn or drop a hot pot" as "her hands are not the same as it [sic] used to be." Tr. 122. Martika stated that her mother used to "make her own clothing," but no longer does as "her hands are not as healthy" as they once were. Tr. 123. She added that plaintiff's hands were weak and numb. Tr. 124.

Unlike with plaintiff's lower extremity complaints, the ALJ's RFC finding failed to account for any manipulative limitations. Even the state medical consultant, whose opinion the ALJ accorded "significant weight," opined that plaintiff's handling and fingering were limited. Tr. 29, 222. Because, as indicated by SSR 96–9p, upper extremity restrictions are so significant at the sedentary level, the court finds that the ALJ erred in relying on the grids to support his "not disabled" decision, rather than consulting the vocational expert.

### IV. CONCLUSION

For the foregoing reasons, it is **ORDERED** that the Commissioner's decision to deny plaintiff disability benefits is **REVERSED** and this case is **REMANDED** to the Commissioner for further proceedings consistent with this order and opinion.

**AND IT IS SO ORDERED.**

**REPORT AND RECOMMENDATION**

JOSEPH R. McCROREY, United States Magistrate Judge.

This case is before the Court pursuant to Local Rule 83.VII.02, *et seq.*, D.S.C., concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").

### *ADMINISTRATIVE PROCEEDINGS*

Plaintiff applied for DIB and SSI in March 2006, alleging disability as of January 1, 2005,[1] due to low back pain, arthritis in her knees and ankles, high blood pressure, carpal tunnel syndrome, obesity, and depression. Plaintiff's applications were denied initially and on reconsideration, and she requested a hearing before an administrative law judge (the "ALJ"). After a hearing held October 15, 2007, at which Plaintiff appeared and testified,[2] the ALJ issued a decision dated November 9, 2007, finding that Plaintiff had the residual functional capacity to perform unskilled sedentary work and was, therefore, not disabled within the meaning of the Social Security Act.

Plaintiff was forty-seven years old at the time of the ALJ's decision. She has a ninth grade education with past relevant work as a cook and tomato sorter. (Tr. 35, 38, 96–97, 100).

The ALJ found (Tr. 24–30):

1. The claimant met the insured status requirements of the Social Security Act through December 31, 2009.

2. The claimant has not engaged in substantial gainful activity since January 1, 2005, the onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. The claimant has the following severe combination of impairments: obesity, tachycardia, and carpal tunnel syndrome (20 CFR 404.-1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to: sit for 6 hours of an 8–hour day; stand/walk for 2 hours of an 8–hour day; frequently lift/carry light items; and occasionally lift 10 pounds.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on July 16, 1960 and was 45 years old, which is defined as a younger individual, on the disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

---

1. Plaintiff originally alleged a disability onset date of January 1, 1992, but later amended that date to January 1, 2005, the date she last worked. (Tr. 22, 36–37, 107).

2. Plaintiff, who is currently represented by counsel, was unrepresented at the hearing before the ALJ.

9. Transferability of job skills is not material to a determination of disability because applying the Medical–Vocational Rules directly supports a finding of "not disabled," whether or not the claimant has transferable job skills (See SSR 82–41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2005 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

The Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making the determination of the ALJ the final decision of the Commissioner. (Tr. 2–6). Plaintiff then filed this action in the United States District Court on July 23, 2008.

### SCOPE OF REVIEW

The Social Security Act (the "Act") provides that, for "eligible"[3] individuals, benefits shall be available to those who are "under a disability," defined in the Act as the inability:

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).[4]

In evaluating whether a claimant is entitled to disability benefits, the ALJ must follow the five-step sequential evaluation set forth in the Social Security regulations. *See* 20 C.F.R. § 404.1520. The ALJ must consider whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to her past work, and (5) if not, whether the claimant retains the capacity to perform specific jobs that exist in significant numbers in the national economy. *See id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored. Thus, the only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir.2005). Consequently, the Act precludes a de novo review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir.2001) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir.1996)). Substantial evidence is:

---

**3.** Eligibility requirements for DIB are found at 42 U.S.C. § 423(a)(1), and for SSI at 42 U.S.C. § 1382(a).

**4.** The regulations applying these sections are contained in different parts of Title 20 of the Code of Federal Regulations (C.F.R.). Part 404 applies to federal old-age, survivors, and disability insurance, and Part 416 applies to supplemental security income for the aged, blind, and disabled. Since the relevant portions of the two sets of regulations are identical, the citations in this report will be limited to those found in Part 404.

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"
*Shively v. Heckler,* 739 F.2d 987, 989 (4th Cir.1984) (quoting *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir.1966)). It must do more, however, than merely create a suspicion that the fact to be established exists. *Cornett v. Califano,* 590 F.2d 91, 93 (4th Cir.1978).

 Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that this conclusion is rational. *Thomas v. Celebrezze,* 331 F.2d 541, 543 (4th Cir.1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir.1972).

### DISCUSSION

In her brief before the court, Plaintiff alleges that the ALJ erred in failing to: (1) find that her arthritis and sleep apnea were severe; (2) assess whether her sleep apnea met a "Listing"; (3) further develop the record; (4) find that she cannot perform the full range of "sedentary" work; and (5) obtain testimony from the vocational expert. The Commissioner contends that the ALJ's decision is supported by substantial evidence and free of legal error.

### A. Failure to Develop the Record

 Plaintiff does not raise this issue first, but the undersigned finds it best to do so, as it impacts the others. Plaintiff contends that the ALJ committed reversible error in failing to fully develop the

record. The burden to prove disability in a social security case is on the claimant, and to meet this burden, the claimant must furnish medical and other evidence of the existence of the disability. *Bowen v. Yuckert,* 482 U.S. 137, 146, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *see also* 20 C.F.R. § 404.1512.

The Commissioner, however, also has a role in this fact-finding, *see id.,* and it is well established in the Fourth Circuit that a claimant, appearing pro se, is "entitled to the sympathetic assistance of the ALJ to develop the record, to assume a more active role and to adhere to a heightened duty of care and responsibility." *Crider v. Harris,* 624 F.2d 15, 16 (4th Cir.1980) (internal citations omitted). When presented with a pro se claimant, the ALJ is charged to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Marsh v. Harris,* 632 F.2d 296, 298 (4th Cir.1980) (internal citations omitted). If the ALJ's failure to do so results in less than a "full and fair hearing of their claims," then "good cause" may be available to remand "for the taking of additional evidence." *Sims v. Harris,* 631 F.2d 26, 27 (4th Cir.1980) (citations omitted). Such good cause, however, is dependent on a showing that "absence of counsel created clear prejudice or unfairness to the claimant." *Id.* at 28.

Plaintiff's complaint here stems from events at her hearing. The hearing transcript reveals that the ALJ was familiar with Plaintiff's record, and he questioned her as to her different impairments. (*See* Tr. 38–45). When the ALJ asked who was treating her "this year," Plaintiff responded that she had "different doctors" because she had no medical insurance, "So, I was just going to like the emergency room,

and stuff like that." (Tr. 39). The ALJ asked Plaintiff to be more specific, and she answered, "To [the Medical University of South Carolina ("MUSC")]and Roper."[5] (*Id.*)

The ALJ delved further:

Q: And what have you been going for at MUSC and Roper?

A: My heart. My medical—I had to go in the hospital in—well, in January, they kept me for like a week and a half for my heart. . . .

. . .

For my heart and a blockage in my arteries.

. . .

Q: Now, you said you went to MUSC. What did you go to Roper for this year?

A: The same thing.

Q: Were you in the hospital?

A: Hard breathing. No, no, sir, they didn't keep me. I couldn't stay.

(Tr. at 39–40). After some questioning regarding Plaintiff's medications, the ALJ asked again:

Q: And there's no specific doctor that's been treating you all along? You've been seeing different doctors?

A: Yes, sir, for the same thing.

Q: Okay. Now, you've talked about heart. Have you been treated for any other problems other than your heart this year?

A: In February of this year here, I found that I had—was no oxygen flowing from my brain to my heart, or something like that, that (INAUDIBLE). I've got to sleep with a machine every night.

(Tr. at 41–42). The ALJ correctly guessed that Plaintiff was referring to her obstructive sleep apnea.

At the end of the hearing, the ALJ spoke directly to Plaintiff:

Here's what's going to happen, Ms. Washington, okay? I don't have all the records, okay? And, and, and the reason why I don't have all the records is because you were hospitalized in January of this year, okay? I don't have those records, okay? And obviously, *if you went to Roper at all,* I don't have those records, as well. So, what I have to do in order to make sure I have everything is, I will have to, after this hearing is over, contact MUSC, *and contact Roper.* I will update the treatment records for you for this year. After I've gotten all those records, I will make a decision, okay?

. . .

[I]t doesn't work that, that, you know, we do it when—if we don't know, if we don't know the information, okay? And, and, as I said—that's why I asked you at the beginning of the hearing if we have anything. And obviously, I have to get that. You've had some significant treatment for your heart, okay? When they hospitalize you for 10 days, that's pretty significant. I have to get those records. Once I have those records, I'll make the decision, and I'll enter it. Thank you.

(Tr. 47–48) (emphases added).

Thus, the ALJ perceived a gap in Plaintiff's treatment records, and the final transcript shows that he was at least partially effective in filling that gap, as there are records from MUSC dating through August 2007. (*See* Tr. 234–406). The transcript also shows that the ALJ acted on his

---

**5.** "Roper" can apply to any one of several different entities of Roper St. Francis Healthcare. *See* Roper St. Francis Healthcare, *http://www.rsfh.com/Categories/Facilities/ Documents/systemmapflyer7.09.pdf* (listing 17 different locations).

representations quickly; the first page of these records is date-stamped "RE-CEIVED" October 15, 2007—the same day as Plaintiff's hearing. (*See* Tr. 234). These records detail Plaintiff's 2007 treatment for bronchitis, pneumonia, and pulmonary edema in January (spanning six days); her sleep study in February; an overnight hospitalization for congestive heart failure in May; and an emergency room consultation for headache and chest pain in August.

Plaintiff argues, however, that the ALJ erred in not obtaining her medical records from Sea Island Medical Clinic ("SIMC"), to which he referred in his opinion. (*See* Tr. 28). Indeed, Plaintiff listed "Genevieve Jones" [6] as her "Family Doctor" (*e.g.,* Tr. 236, 252, 275; *see also* 337, 366 (SIMC)), and MUSC's discharge orders instructed Plaintiff to follow-up with SIMC (*e.g.,* Tr. 278, 314, 333, 364). There is even an "Authorization for Release of Information" from SIMC to MUSC dated January 17, 2007, signed by Plaintiff (Tr. 247), indicating that Plaintiff visited the clinic at least once during 2007, presumably in compliance with MUSC discharge instructions (*e.g.,* Tr. 278).

Indeed, there is no showing that the ALJ attempted to procure Plaintiff's records from either Roper or SIMC, and the apparent conflicts between her testimony and the MUSC records suggest that Plaintiff's recollection was not accurate. The January 2007 MUSC records show that, contrary to her account, Plaintiff had a three-day hospitalization secondary to pulmonary edema. (*See* Tr. 252–325). In May 2007, MUSC treated Plaintiff for congestive heart failure, but only overnight.

(Tr. 328–87). As Plaintiff referred to a lengthy hospitalization for her "heart and a blockage in [her] arteries," this treatment may have occurred in a Roper facility.

Rather, the ALJ relied on Plaintiff's seeming lack of medical care in making his findings. He stated that there was no documentation that Plaintiff "has sought treatment from anyone other than the emergency room and on one occasion at James Island Family Practice." (Tr. 28). The ALJ added that "[t]here is *no* evidence of record that the claimant attempted to obtain low—or no-cost medical care" (Tr. 28 (emphasis added)), yet SIMC is apparently a facility that offers either free or low-cost medical care, *see* Free Medical Clinics/Camps All over USA, http://www.freemedicalcamps.com/vcampinfo.php?campid=3800. The ALJ repeats Plaintiff's statement (Tr. 28) in May 2007 that she had not been to SIMC "in some time" (Tr. 337), yet MUSC's records show that Plaintiff had been there at least four months earlier (*see* Tr. 247). In formulating Plaintiff's residual functional capacity ("RFC"), the ALJ observes that she "sought medical care primarily from the emergency room and has failed to follow up with additional treatment" (Tr. 29); however, MUSC's records indicate that Plaintiff visited SIMC at least once for follow-up treatment.[7]

Additionally, the ALJ noted that none of Plaintiff's treating physicians opined as to her "functional limitations" (Tr. 29), but the records of her treating physician(s) may include suggested restrictions. Moreover, Plaintiff had no representative to

---

6. At least at one point, Dr. Genevieve Jones was a physician at SIMC. *See Stroke Belt Elimination Initiative 2004–2008: Stroke Belt Community Action Team Plan (SBCAT)* 7, http://worst2first.musc.edu/dash/files/cat_plan.pdf.

7. The ALJ also wrote that there was no evidence that hand surgery had been recommended (Tr. 28), but the March 6, 2006 MUSC record advises Plaintiff to follow-up with "FCF Clinic for surgery" (Tr. 146).

request such opinion(s), and Plaintiff's education is clearly limited. *Walker v. Harris*, 642 F.2d 712 (4th Cir.1981), advises remand where the ALJ "fails diligently to explore all relevant facts *especially in cases of uneducated, pro se claimants*" and where nonrepresentation appears to result in prejudice. *Id.* at 714 (emphasis added). Plaintiff testified that she completed only the ninth grade[8] (Tr. 35), and her "Function Report" reveals that she is neither "a reader" nor "good on counting" (Tr. 121). In fact, it appears that her teenaged daughter, Martika, completed most of her handwritten forms. (*See, e.g.*, Tr. 59 (Request for Reconsideration, signed by Martika); 67 (Request for Hearing, signed by Martika); 119 (Function Report); 200 ("New Patient Information Sheet")). Martika explained that her mother was once given a pamphlet to read "and she couldn't do it." (Tr. 125).

Because the ALJ's credibility and RFC findings appear to be negatively affected by Plaintiff's lack of medical documentation, which the ALJ stated *he* would obtain, it is recommended that this action be remanded.[9] *Cf. Jones v. Sullivan*, 949 F.2d 57, 61 (2d Cir.1991) (finding good cause to remand pro se claimant's case when the claimant clearly "was relying on the ALJ to secure the necessary information from her treating physicians"). The undersigned's recommendations as to Plaintiff's remaining issues, as discussed below, are based on the record as currently formulated and may differ depending on the content of the missing records. *Cf.*

*Wilkins v. Secretary, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (new evidence is reviewed, together with the remainder of the record, to determine whether substantial evidence supports the Commissioner's findings).

## B. Severity

 Plaintiff objects to the ALJ finding that her arthritis and sleep apnea were not severe impairments. It is the claimant's burden to prove that he or she suffers from a medically severe impairment. *Bowen v. Yuckert*, 482 U.S. 137, 145 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). A nonsevere impairment is defined as one that does not "significantly limit [a claimant's] physical or mental ability to do basic work activities." *Id.* § 404.1521(a). Basic work activities include:

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

---

8. Even if Plaintiff actually completed the tenth grade, as stated in her Disability Report, that was in 1978, when she would have been almost eighteen years old. (*See* Tr. 100).

9. The Commissioner responds that, "if there are additional medical records from [SIMC] or Roper, and *if* these records somehow support Plaintiff's claim as she now alleges, the Plaintiff's counsel could have obtained

them[.]" Def.'s Br. at 18. It appears to the Court, however, that such an argument would relieve the ALJ of any record-building duty, as he or she could always assume that a losing claimant will procure a lawyer who would then obtain the missing records. Defendant's argument disregards the law of the Fourth Circuit as set forth in *Marsh, Sims, Crider*, and others.

(6) Dealing with changes in a routine work setting.

*Id.* § 404.1521(b).

A severe impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms[.]" *Id.* § 404.1508. A claimant's own description of her physical or mental impairment is not enough to establish that there is, in fact, a physical or mental impairment. *Id.* § 404.1528(a).

The ALJ noted Plaintiff's testimony that she has arthritis in her knees and needs a knee replacement. (Tr. 27). She also based her disability application, in part, on arthritis in her ankles and knees. (*See* Tr. 95). When Plaintiff saw Dr. Barry Weissglass for her consultative examination, she complained of arthritis in her left ankle since a 1992 fracture and cracking, but neither locking nor swelling, in her knees. (Tr. 227).

Yet, as the ALJ explained, Dr. Weissglass found only a small amount of crepitus in Plaintiff's knees and no instability, heat, or effusion. (Tr. 28; *see also* Tr. 228). He described the findings as "minimal." (Tr. 229). Also, the doctor found no crepitus in Plaintiff's ankle, merely decreased range of motion. (Tr. 228). As the Court found in *Craig v. Chater,* 76 F.3d 585 (4th Cir.1996), a claimant's allegations about her pain "need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment[.]" *Id.* at 595. Thus, the record, as currently constituted, contains substantial evidence to support the ALJ's finding.

Plaintiff points out that Dr. Weissglass speculated that her musculoskeletal limitations "would make it difficult for her to do repetitive walking, prolonged standing, bending, kneeling, and repetitive lifting[.]" (Tr. 229). But Social Security Ruling ("SSR") 85–28 specifically provides that *"medical evidence alone* is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities." *Id.* (emphasis added). In addition, a physician with expertise in Social Security law,[10] referring to Dr. Weissglass's report, opined that Plaintiff would be able to stand and/or walk for six of eight hours. (Tr. 220). *See* SSR 85–28 (providing that a finding of not severe "requires a careful evaluation of the medical findings ... and an informed judgment about its (their) limiting effects"). Thus, the ALJ was justified, on the current record, in relying upon the expert's determination and Dr. Weissglass's minimal findings to find that Plaintiff's arthritis was not severe.

To the extent, however, that the ALJ may have erred in finding Plaintiff's arthritis to be non-severe, Plaintiff has suffered no harm. *See Mickles v. Shalala,* 29 F.3d 918, 921 (4th Cir.1994) (affirming denial of benefits where the ALJ erred in evaluating a claimant's pain because "he would have reached the same result notwithstanding his initial error"). A finding of a single severe impairment at step two of the sequential evaluation is enough to ensure that the factfinder will progress to step three. *See Carpenter v. Astrue,* 537 F.3d 1264, 1266 (10th Cir.2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence.").

---

**10.** State agency medical and psychological consultants "are highly qualified physicians and psychologists who are experts in the eval-

uation of the medical issues in disability claims under the Act." SSR 96–9p.

The undersigned agrees with other courts that find no reversible error where the ALJ does not find an impairment severe at step two provided that he or she considers that impairment in subsequent steps. *See, e.g., Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir.2007); *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir.1987); *Newsome v. Barnhart*, 444 F.Supp.2d 1195, 1200–01 (M.D.Ala.2006); *Ottman v. Barnhart*, 306 F.Supp.2d 829, 839 (N.D.Ind.2004).

Although the ALJ declined to find Plaintiff's arthritis "severe," he nevertheless accorded "significant weight" to Dr. Weissglass's opinion. (Tr. 29). Also, even though he found Plaintiff's statements "not entirely credible" (Tr. 27), the ALJ gave Plaintiff "the benefit of the doubt," and reduced her RFC "to include limitations in the amount she can sit, stand, walk, lift and carry" (Tr. 29). Because the ALJ thus accounted for limitations that may have been caused by Plaintiff's arthritis, he did not commit reversible error in failing to find it severe.

Plaintiff additionally complains that the ALJ failed to find that her obstructive sleep apnea was a severe impairment. The burden is upon the claimant, not only to provide medical evidence establishing the existence and severity of his claimed impairments, but also to establish how those impairments affect his functioning. 20 C.F.R. § 404.1512(a).

Plaintiff's medical records establish the existence of her impairment, but the current record contains no evidence of how it significantly limits her physical or mental ability to do basic work activities. *See Williamson v. Barnhart*, 350 F.3d 1097, 1100 (10th Cir.2003) ("the mere presence

of a condition is not sufficient to make a step-two showing"); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir.1988) ("The mere diagnosis ... says nothing about the severity of the condition."). There is no mention of any sleep disorder-related difficulties either on Plaintiff's disability forms or in her medical records. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir.2001) (finding it "significant" to the severity analysis that plaintiff failed to allege depression in her benefits application). Moreover, when asked by the ALJ why she could not work, Plaintiff cited hand, knee, leg, and ankle difficulties only. (Tr. 42–45).

In fact, Plaintiff's sleep apnea only came to light late in the relevant period, when emergency room staff witnessed a significant desaturation. (*See* Tr. 277–78). After using a CPAP,[11] Plaintiff stated that she slept well at night. (Tr. 328). Hence, this record supports the absence of obstructive sleep apnea in the ALJ's severity analysis. *See* SSR 96–8p (when there is neither allegation nor record citation of a certain limitation or restriction, the adjudicator must consider the claimant to have no such limitation or restriction); *Fonseca v. Chater*, 953 F.Supp. 467, 471 (W.D.N.Y. 1996) (finding the Commissioner's decision supported by substantial evidence, although it did not discuss the plaintiff's high blood pressure, because the plaintiff "did not allege, in either his disability application or hearing testimony, that he experienced any symptoms or limitations as a result of" that ailment).

## C. The Listings

In her discussion of obstructive sleep apnea, Plaintiff alleges that the ALJ erred

---

**11.** An abbreviation of "continuous positive airway pressure," CPAP is "a technique of respiratory therapy, in either spontaneously breathing or mechanically ventilated patients, in which airway pressure is maintained above atmospheric pressure throughout the respiratory cycle by pressurization of the ventilatory circuit." *Stedman's Medical Dictionary* 421, 1442 (27th ed. 2000) [hereinafter *Stedman's* ].

in failing to determine whether this impairment met or equaled Listing 3.10. This analysis, however, is very different from that of assessing severity. It takes place at step three of the sequential procedure, where the ALJ is required to compare the claimant's physical and mental impairments with those provided in the "Listing of Impairments" provided at 20 C.F.R. Part 404, Subpart P, Appendix 1 [12] (the "Listings").

It is not enough that the impairment has the diagnosis of a listed impairment; the claimant must also have the findings shown in the listing of that impairment: "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990); *see also* 20 C.F.R. § 404.1525(d). The ALJ compares the symptoms, signs, and laboratory findings of the impairment, as shown in the medical evidence, with the medical criteria for the listed impairment. Medical equivalence can be found if the impairment(s) is/are at least equal in severity and duration to the criteria of any listed impairment. 20 C.F.R. § 404.1526(a).

Because the ALJ did not find Plaintiff's obstructive sleep apnea to be "severe," there was no reason for him to assess whether it met or equaled a Listing. The regulations require that the claimant establish "a *severe* medically determinable impairment(s)." 20 C.F.R. § 404.1525(c)(2) (emphasis added); *see also id.* § 404.1526(a) (providing that, to establish "medical equivalence," the impairment(s) must be "at least equal in *severity* and duration to the criteria of any listed impairment" (emphasis added)); *id.* § 404.1520(c)(iii) ("At the third step, *we also consider the medical severity* of your impairment(s)." (emphasis added)). Plaintiff's citation to *Cook v. Heckler*, 783 F.2d 1168 (4th Cir.1986), is not controlling as the Fourth Circuit Court of Appeals there remanded, in part, because the ALJ failed to explain why Cook's *severe* impairment of arthritis did not satisfy Listing 1.01 criteria. *Id.* at 1173.

Nevertheless, if severe, the ALJ would have analyzed Plaintiff's obstructive sleep apnea under Listing 3.09 or 12.02, as directed by Listing 3.10 ("Sleep-related breathing disorders"). Plaintiff's medical records, however, fail to establish the criteria of "Chronic cor pulmonale and pulmonary vascular disease," *see* Listing 3.00G,[13] or "Organic Mental Disorders," *see* Listing 12.02.[14] Accordingly, the record, as it currently stands, fails to establish that Plaintiff's obstructive sleep apnea fits the criteria of Listing 3.10.

## D. RFC/Step Five Finding

Plaintiff next argues that the ALJ erred in finding that she had the RFC to per-

---

**12.** The Listing of Impairments is applicable to SSI claims pursuant to 20 C.F.R. § 416.911.

**13.** The establishment of an impairment attributable to irreversible cor pulmonale secondary to chronic pulmonary hypertension requires documentation by signs and laboratory findings of right ventricular overload or failure (e.g., an early diastolic right-sided gallop on auscultation, neck vein distension, hepatomegaly, peripheral edema, right ventricular outflow tract enlargement on x-ray or other appropriate imaging techniques, right ventricular hypertrophy on ECG, and increased pulmonary artery pressure measured by right heart catheterization available from treating sources). 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00G.

**14.** Plaintiff's records do not show "[p]sychological or behavioral abnormalities associated with a dysfunction of the brain," as they contain no evidence, at the very least, of (i) loss of specific cognitive abilities or affective changes or (ii) history of a chronic organic mental disorder. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02.

form the full range of sedentary work because she also suffered from nonexertional limitations. As a result, the ALJ mistakenly relied on the "grids" to determine that she was not disabled.

At step five of the sequential evaluation, the Commissioner bears the burden of providing evidence of a significant number of jobs in the national economy that a claimant could perform. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir.2002). To improve both the uniformity and efficiency of this determination, the Commissioner promulgated the Medical–Vocational Guidelines (the "grids"),[15] located at 20 C.F.R. Part 404, Subpart P, Appendix 2. *Heckler v. Campbell*, 461 U.S. 458, 461, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). Each grid, however,

> considers only the strength or exertional component of a claimant's disability in determining whether jobs exist that the claimant is able to perform in spite of his disability. Thus, in cases where pain occurs only upon exertion and limits one's strength functioning, the grid tables will apply. But when a claimant suffers from both exertional and nonexertional limitations, the grid tables are not conclusive but may only serve as guidelines.

*Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir.1989) (citing *Wilson v. Heckler*, 743 F.2d 218 (4th Cir.1984)); *see also* 20 C.F.R. § 404.1569a(d). When the Commissioner is unable to rely on the grids, he must prove through vocational expertise that jobs exist in the national economy which the claimant can perform. *Walker*, 889 F.2d at 49–50.

Plaintiff asserts that her "nonexertional impairment" results from her bilateral carpal tunnel syndrome ("CTS"), which is evidenced in the record as follows:

- MUSC diagnosis in March 2006 based on positive Phalen's[16] and Tinel's[17] signs (Tr. 145–46; *see also* Tr. 147–48);
- Dr. Weissglass's listing of CTS among Plaintiff's diagnoses (Tr. 229);
- March 2006 James Island Family Practice ("JIFP") record noting Plaintiff's complaints of numbness and tingling in both hands (Tr. 198);
- Plaintiff's testimony of hand swelling and numbness (Tr. 42–43).

Plaintiff contends that her CTS results in "manipulative limitations" that would erode the sedentary base under SSR 96–9p, which provides, "Most unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity. Fine movements of small objects require use of the fingers; e.g., to pick or pinch. Most unskilled sedentary jobs re-

---

**15.** The grids:

> consist of a matrix of the four factors identified by Congress—physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy. Where a claimant's qualifications correspond to the job requirements identified by a rule, the guidelines direct a conclusion as to whether work exists that the claimant could perform. If such work exists, the claimant is not considered disabled.

*Heckler v. Campbell*, 461 U.S. 458, 461–62, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983) (footnotes omitted). The grids are applicable to SSI claims pursuant to 20 C.F.R. § 416.969.

**16.** Phalen maneuver: maneuver "in which the wrist is maintained in volar flexion; paresthesia occurring in the distribution of the median nerve within 60 sec[onds] may be indicative of [CTS]." *Stedman's* at 1061.

**17.** "[A] sensation of tingling, or of 'pins and needles,' felt at the lesion site or more distally along the course of a nerve when the latter is percussed; indicates a partial lesion or early regeneration in the nerve." *Stedman's* at 1640.

quire good use of the hands and fingers for repetitive hand-finger actions." *Id.*

SSR 96–9p does provide that unskilled sedentary work involves the nonexertional capacity for manipulation. It further advises that,

> Any significant manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base.... When the limitation is less significant, especially if the limitation is in the non-dominant hand, it may be useful to consult a vocational resource.

*Id.* Thus, if Plaintiff's assertions are established, the ALJ would not be able to rely on the grids to satisfy the step five burden.

The ALJ wrote that, although MUSC assessed Plaintiff with CTS, there is no record that it was evaluated by an objective study. (Tr. 28). Review of the record, however, reveals that JIFP had "consider[ed]" such a study (Tr. 198), Plaintiff told the state disability worker that her CTS treatment included a "test" (Tr. 99), and Dr. Weissglass wrote that Plaintiff's CTS had been diagnosed by a nerve conduction study (Tr. 227). The ALJ also relied on the absence of a surgical option (Tr. 28), but the MUSC physician *did* recommend surgery (Tr. 146).

The ALJ further observed that Plaintiff's hand x-rays were "generally unremarkable" (Tr. 28), yet "[t]his objective finding is of little relevance because x-rays are not among the diagnostic tools typically used to evaluate [CTS]." *Jenkins–Dewindt v. Astrue*, No. 5:07–cv–314–Oc10GRJ,

2008 WL 3889736, *7 (M.D.Fla. Aug. 20, 2008) (citing Nat'l Inst. of Neurological Disorders & Stroke, "Carpal Tunnel Syndrome Fact Sheet" (Nat'l Inst. Health, Pub. No. 03–4898, 2002)). But the ALJ did correctly note that Dr. Weissglass failed to find either a Tinel's or Phalen's sign and deemed Plaintiff's CTS exam "negative." (*See* Tr. 228, 229). Overall, however, the ALJ's misstatement of the record fails to support his decision not to believe Plaintiff "regarding the extent of her limitation related to" her CTS. (Tr. 28).

At step three, the ALJ determined that Plaintiff's CTS had "not resulted in an inability to perform fine and gross movements effectively,"[18] referring to Listing 1.02, or "in a significant disorganization of motor function,"[19] referring to Listing 11.00C. (Tr. 26). These levels of severity, however, are not required in order for the record to establish that Plaintiff suffered a manipulative limitation such that vocational testimony was required. Plaintiff's Disability Report records her complaint of constant hand pain with "no strenght [sic] to pick up anything." (Tr. 96). The state agency worker who assisted with her reporting observed that Plaintiff had difficulty using her hands and with writing. (Tr. 103). Her daughter, Martika, explained that Plaintiff's cooking habits have changed because of fear that she will "burn or drop a hot pot" as "her hands are not the same as it [sic] used to be." (Tr. 122). Martika stated that her mother used to "make her own clothing," but no longer does as "her hands are not as healthy" as

---

**18.** [E]xamples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2c.

**19.** Listing 11.00 provides that "persistent disorganization of motor function" can take the form of paresis, paralysis, involuntary movements, ataxia, or sensory disruption, either singly or in combinations. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00C.

they once were. (Tr. 123). She added that Plaintiff's hands were weak and numb. (Tr. 124).

Unlike with Plaintiff's lower extremity complaints, the ALJ's RFC finding failed to account for any manipulative limitations.[20] Even the state medical consultant, whose opinion the ALJ accorded "significant weight" (Tr. 29), opined that Plaintiff's handling and fingering were limited (Tr. 222). Because, as indicated by SSR 96–9p, upper extremity restrictions are so significant at the sedentary level, the undersigned finds that the ALJ erred in relying on the grids to support his "not disabled" decision, rather than consulting a vocational expert.

## CONCLUSION

The Commissioner's decision is not supported by substantial evidence. This action should be remanded to the Commissioner to complete development of the record as more particularly instructed herein and, thereafter, to re-evaluate his findings in view thereof.

RECOMMENDED that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), and that the case be remanded to the Commissioner for further administrative action as set out above.

---

**20.** Plaintiff also refers to her nonexertional limitations of bending and kneeling, as found by Dr. Weissglass, but SSR 96–9p states that postural restrictions related to kneeling—bending the legs alone, SSR 85–15—would not significantly erode the occupational base for unskilled sedentary work. Further, SSR 83–10 explains that sedentary work involves no significant "stooping," i.e., "bending the body downward and forward by bending the spine at the waist," SSR 85–15.